UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GARTNER, INC., | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PHILIP MCKAY, | : | |
| | : | |
| Defendant. | : | NOVEMBER 17, 2006 |
| | : | |

### VERIFIED COMPLAINT

Plaintiff, Gartner, Inc. ("Gartner"), through its counsel, for its complaint against the

defendant Philip McKay ("McKay"), alleges as follows:

### INTRODUCTION

1.      This is an action brought by Gartner for damages and equitable relief caused by

the unlawful conduct of its former highly compensated executive, Philip McKay.  In violation

of his employment agreement with Gartner, McKay has created a company to compete directly

with Gartner in the events market – a market in which McKay will perform the same services

for the same clients as he did for Gartner.  In so doing, McKay is using and disclosing

Gartner's trade secrets and proprietary, confidential information, capitalizing on the

relationships that he established while working for Gartner and exploiting the goodwill Gartner

has built up the marketplace.  McKay's actions thus constitute breach of contract, trade secret

misappropriation and unfair and deceptive trade practices.

## THE PARTIES

2. The plaintiff Gartner is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut.

3. The defendant, McKay, is an individual residing at 50 Newfane Lane, Bedford, New Hampshire.

## JURISDICTION AND VENUE

4. Jurisdiction exists in this Court based on complete diversity of citizenship between the parties and because the value of the rights of the plaintiff implicated by the conduct alleged herein and the actual and potential loss to the plaintiff as a result of the defendant's unlawful conduct exceed $75,000 pursuant to 28 U.S.C. § 1332.

5. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of the property that is the subject of this action is situated in Connecticut, and because the parties have expressly consented to the jurisdiction of the federal courts located in the state of Connecticut.

## GARTNER'S BUSINESS

6. Gartner is the leading global provider of research and analysis in the information technology ("IT") industry. Gartner's principal business segments include research, consulting, executive programs and events.

- 2 -

7.     Among other things, Gartner offers the Vision Events Program, which includes highly focused, business-intensive events that bring together leading IT vendors and senior-level IT decision makers.

8.     IT vendor attendees are carefully chosen by Gartner using criteria developed over many years through the great effort and expense.  Vendors offer IT solutions which include, among others, outsourcing solutions, knowledge management models, global human resource information systems ("HRIS"), customer relationship management systems ("CRM"), data warehousing and business intelligence.

9.     Attendance by IT decision-makers is by invitation only.  Gartner's Vision Events web site allows a prospective attendee to apply online to qualify for attendance at a particular event.  Attendees include, among others, senior IT executives, including CIOs, IS Directors, Vice Presidents of IT and others responsible for strategic IT decision-making, including the evaluation, negotiation and selection of IT solutions, including HR solutions, for their businesses.  Gartner pays travel and lodging expenses for those chosen to attend its Vision Events programs.

10.     The format of Vision Events programs is unique to Gartner and has been developed over many years at great effort and expense.  This unique format includes, among other things:

(a)     one-on-one meetings between IT vendors and IT decision makers;

(b)     private boardroom appointments between IT vendors and a guaranteed audience of IT decision-makers;

- 3 -

(c)     pre-scheduled networking activities, such as golf-outings, luncheons and evening social events;

(d)     sessions with Gartner analysts and other industry experts addressing the most current research and analysis relating to the challenges and opportunities in the market;

(e)     roundtable discussions;

(f)     best practices discussions moderated by Gartner analysts and other industry experts;

(g)     peer exchanges at which decision-maker attendees and vendors share ideas, give advice and build relationships; and

(h)     trend analyses at which Gartner analysts meet one-on-one with attendees to review industry trends and provide insights on how they affect the attendees' businesses.

11.     Gartner markets its Vision Events programs to IT vendors and senior-level IT decision-makers, including, among others, vendors of technology that includes HR solutions and HR technology decision-makers.

## GARTNER'S AGREEMENT REGARDING
## CERTAIN CONDITIONS OF EMPLOYMENT

12.     In consideration of their employment with Gartner, every employee is required to execute an Agreement Regarding Certain Conditions of Employment (the "Agreement"). A copy of the Agreement executed by McKay is attached hereto, and incorporated herein by reference, as Exhibit A.

- 4 -

13.     The Agreement contains a non-competition/non-solicitation covenant in Section

5, which states in relevant part:

      5.      <u>Non-Competition</u>.

      (a)     <u>Definitions</u>.    The following terms shall have the meanings given them below:

          (i)      <u>Competitive Acts</u> shall mean the development, marketing or selling of—or assisting others to develop, market or sell—a product or service which is competitive with the products or services of the Employer (both those existing during the Employment and those which are planned for the future and of which the Employee learns during the Employment), and the solicitation, directly or indirectly, of the Employer's clients or known prospects for the purposes of developing, marketing or selling such products or services, by the Employee (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise).

          (ii)     <u>Non-Compete Area</u> shall mean any location within a fifty (50) mile radius of the principal office in which the Employee worked at any time during the one year period prior to the termination of the Employment.  If the Employee's principal office was in Stamford, Connecticut at any time during the one year period prior to the termination of the Employment, then the Non-Compete Area shall be defined as any location within (A) a fifty (50) mile radius of Stamford, Connecticut, and (B) the states of Connecticut, New York and Massachusetts.

      (b)     <u>Non-Competition</u>.

          (i)      <u>Analyst or Consultant Position</u>.     The Employee agrees that, for a period of one year following the termination of the Employment for any reason, the Employee will not engage in any Competitive Acts:  (A) with any client of the Employer with whom the Employer has a business relationship and with whom the Employee maintained contact at any time during the Employment; (B) with any product or service vendor with whom the Employer has a business relationship and with whom the Employee maintained contact at any time during the Employment; (C) with any entity or individual to whom the Employee submitted proposals for specific services on behalf of the Employer within one year prior to the termination of Employment; or (D) within the Non-Compete Area.

        (ii)     <u>Sales Position</u>.      The Employee agrees that, for a period of one year following the termination of the Employment for any reason, the Employee will not engage in any Competitive Acts:  (A) with the particular office of any client of the Employer with which office the Employee maintained contact at any time during the Employment; (B) with any entity or individual to whom the Employee submitted proposals for specific services on behalf of the Employer within one year prior to the termination of Employment; or (C) within the Non-Compete Area.

        (iii)    <u>Other Positions</u>.     The Employee agrees that, for a period of one year following the termination of the Employment for any reason, the Employee will not:  (A) engage in any Competitive Acts; (B) engage in any Competitive Acts with any entity or individual to whom the Employee submitted proposals for specific services on behalf of the Employer within one year prior to termination of Employment; or (C) engage in any Competitive Acts within the Non-Compete Area.

14.     The Agreement contains a non-recruitment or hire covenant in Section 5, which states in relevant part:

> During the Employment and for three (3) years following the termination of Employment for any reason, the Employee agrees not to hire, recruit or encourage any person who is then an employee of the Employer to leave the employ of the Employer, whether on the Employee's own behalf or on behalf of any other person or entity.

15.     Section 7 of the Agreement provides that Gartner is entitled to immediately obtain and enforce an injunction prohibiting any employee from violating any terms of the Agreement.

16.     Section 11 of the Agreement contains a choice of law and forum selection clause pursuant to which the parties have consented to the jurisdiction of the federal courts in Connecticut.  That section states:

> This Agreement and the rights of the parties shall be governed by and construed in accordance with the laws of the state of Connecticut without regard to its conflict of laws principles.  Each of the parties consents in advance to the jurisdiction of the appropriate state or federal courts located within the state of Connecticut.

17.     In connection with his employment by Gartner, McKay validly executed a copy of the Agreement on or about July 11, 2002.

## GARTNER'S PROPRIETARY AND CONFIDENTIAL INFORMATION

18.     Gartner has developed and uses a wide variety of proprietary, confidential and trade secret information including, but not limited to, financial information, product and service costs, prices, business strategies, product and service plans, marketing plans and studies, forecasts, computer programs, databases (and documentation and information contained in the databases), computer access codes, know-how, technologies, records, vendor relationships, business relationships, client lists (including identities of clients and prospective clients, identities of individual contacts of business entities which are clients or prospective clients, client spending preferences, businesses or habits), subscription or consultant termination dates, and other confidential or propriety information that has not been made available to the general public ("Confidential Information").

19.     Gartner's Confidential Information is crucial to Gartner as it enables the Company to compete in the marketplace effectively.

20.     The Confidential Information is made up of Gartner's trade secrets in that:

- 7 -

(a)     The Confidential Information is not known by others outside of Gartner;

(b)     Gartner limits its own employees' access to the Confidential Information;

(c)     Gartner has taken reasonable steps to guard the secrecy of the Confidential Information;

(d)     The Confidential Information is extremely valuable to Gartner in providing it with a competitive advantage over its competitors, and it would be extremely valuable to its competitors;

(e)     Gartner has invested a vast amount of time and money on marketing, advertising, telemarketing, attending trade shows and conducting seminars to develop and compile the Confidential Information; and

(f)     It would be virtually impossible for the Confidential Information to be properly acquired or duplicated by others.

21.     Gartner employees have access to the Company's Confidential Information in order to perform their job responsibilities.

22.     Gartner employees are given a specific log-on name and password to provide entry into the computer system on the Company's local area network.  By password protecting the computer system, Gartner guards against unauthorized access to its vital, valuable and confidential information.

23.     When a Gartner employee receives a log-on name and password to the computer, he/she knows that access to the information stored in the computer system is confidential and is not to be disclosed to unauthorized persons.

- 8 -

24.     Gartner employees are expressly instructed that they are not permitted to disclose any of the Company's Confidential Information to anyone outside the Company or use Confidential Information other than for Company business.  Gartner employees are also instructed not to remove any Confidential Information from the work premises unless authorized to do so.

25.     In addition, Gartner employees are instructed that they are not to take any materials containing Confidential Information with them upon termination from the Company. Gartner's policies regarding its confidential, propriety and trade secret information are also set forth in the Company's Code of Conduct Policy, which is available to Gartner employees on the Company's intranet.

26.     The Agreement also contains covenants and representations regarding Gartner's Confidential Information.  In the Agreement, each Gartner employee acknowledges that the Company's confidential information includes items such as financial information, product and service costs, prices, business strategies, product and service plans, marketing plans and studies, forecasts, computer programs, databases (and documentation and information contained in the databases), computer access codes, know-how, technologies, records, business relationships, client lists (including identities of clients and prospective clients, identities of individual contacts of business entities which are clients or prospective clients, client spending preferences, businesses or habits), subscription or consultant termination dates, and other confidential or propriety information that has not been made available to the general public.

27.     Pursuant to the Agreement, Gartner employees further acknowledge that all information related to the operation of Gartner's business is confidential and consists of trade

secrets of Gartner and that all such assets shall remain the property and trade secrets of Gartner and that the disclosure of any of these assets would cause irreparable harm to Gartner.

28.     Pursuant to Section 1 of the Agreement, Gartner employees agree not to use or disclose any of Gartner's Confidential Information other than solely in the furtherance of the Company's business and to take all lawful measures to prevent the unauthorized use or disclosure of the Confidential Information to any third party and to take all lawful measures to prevent unauthorized persons or entities from obtaining or using the Confidential Information and not to take any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information.

29.     The Agreement further provides that a Gartner employee will not remove from the Company's offices any books, records, documents or any information which can be stored in or retrieved from a computer and that the employee will deliver to the company all confidential materials in the employee's possession or control upon termination of employment.

## MCKAY'S EMPLOYMENT WITH GARTNER

30.     On or about July 8, 2002, McKay accepted a written offer of employment from Gartner (the "Employment Offer"). Pursuant to the Employment Offer, McKay became a highly compensated, senior level executive, eventually attaining the position of Group Vice President of the Worldwide Vision Organization, working out of Gartner's Bedford, New Hampshire offices.

31.     In his capacity as Group Vice President, McKay was responsible for all aspects

of Vision Events, including, among other things, responsibility for managing product

development, sponsorship sales, recruitment, web development, marketing strategy, collateral

production, and client and supplier relationships.  McKay had, at a minimum, weekly contact

with vendor sponsors, events advisory boards, event attendees, media partners and suppliers.

In addition, McKay personally attended most events and, consequently, had close contact with

all of Vision Events major constituents.

32.     Through his work as Group Vice President, McKay had access  and exposure to

Vision Events' Confidential Information and trade secrets, including, among other things, the

complete attendee and vendor sponsor database, product and pricing plans, marketing

strategies, and supplier relationships and contracts.  Moreover, McKay himself was

responsible for building all of the events budgets and managing Vision Events' profit and loss.

33.     In conjunction with accepting the Employment Offer, McKay executed an

Agreement Regarding Certain Conditions of Employment, thereby entering into the Agreement

detailed above.

34.     Pursuant to section 5 of the Agreement, McKay agreed:

> that, for a period of one year following the termination of the Employment for
> any reason, the Employee will not:  (A) engage in any Competitive Acts; (B)
> engage in any Competitive Acts with any entity or individual to whom the
> Employee submitted proposals for specific services on behalf of the Employer
> within one year prior to termination of Employment; or (C) engage in any
> Competitive Acts within the Non-Compete Area.

35.     Pursuant to section 5 of the Agreement, McKay further agreed that, during the

term of his employment and for a period of three years following the termination thereof, he

would not, on his own behalf or for anyone else, hire, recruit or encourage any Gartner
employee to leave the employ of Gartner.

## MCKAY'S DEPARTURE FROM GARTNER

36.     In or about December 13, 2005, Gartner realigned the Vision Events
organization, resulting in the elimination of McKay's position.

37.     McKay's employment with Gartner was terminated as of December 13, 2005.

38.     As part of his separation from Gartner, McKay was offered and accepted a
severance package. In connection with his acceptance of the severance package, McKay and
Gartner entered into a Separation Agreement and Release of Claims ("Separation Agreement")
dated December 13, 2006.

39.     Section 4 of the Separation Agreement states in relevant part:

> 4.     Continuing Obligations.     The Employee acknowledges that the
> severance and/or other benefits contained herein constitute substantial
> consideration to him or her and that s/he restates his or her commitment to
> adhere to those obligations to Gartner as are set forth in the Agreement
> Regarding Certain Conditions of Employment, including, but not limited to the
> post termination restrictions regarding confidential information, non-competition
> and non-solicitation. Such agreements and conditions remain in full force and
> effect and are not amended in any way by this Agreement.

40.     At or about the time his employment with Gartner was terminated, McKay also
was verbally reminded by Gartner of his obligations under the Agreement.

## MCKAY FORMS PPM MEDIA TO COMPETE WITH GARTNER

41.     Upon information and belief, in or about June, 2006, McKay formed PPM Media, Inc. ("PPM Media"), a Delaware corporation with its principal place of business in Boston, Massachusetts.  McKay is the President and CEO of PPM Media.

42.     Upon information and belief, McKay has solicited and recruited at least one Gartner employee to terminate her employment with Gartner to work for PPM Media.

43.     Upon information and belief, McKay formed PPM Media to compete with Gartner in the events market.  Specifically, McKay creates, produces and manages business-to-business events that target Gartner's IT vendors and IT executive attendees and that utilize the unique Gartner face-to-face format.

44.     Upon information and belief, McKay has planned and organized such an event, entitled HR IT Insight, which is scheduled to take place in or about March 2007.

45.     The HR IT Insight event competes directly with Gartner's Vision Events in the events market and targets both IT vendors and senior-level IT executives.

46.     The HR IT Insight events mimics almost exactly the unique format of Gartner's Vision Events programs, which McKay was exposed to and became familiar with during his tenure as Group Vice President at Vision Events.  Specifically, the HR IT Insight event includes:

      (a)     scheduled meetings between IT vendors and IT executives;

      (b)     one-on-one meetings between the IT vendors and IT decision makers;

      (c)     general and one-on-one sessions with industry analysts;

- 13 -

(d)     networking activities, including meals and evening social events;

(e)     peer exchange sessions; and

(f)     roundtable and panel discussions

47.     Like Gartner's Vision Events programs, attendance at the HR IT Insight event is by invitation only and McKay's HR IT Insight web site allows a prospective attendee to apply online to qualify for attendance. Upon information and belief, PPM Media pays for chosen attendee's travel and accommodation expenses.

48.     McKay announced the HR IT Insight event on or about October 25, 2006 on the HR IT Insight website and by press release.

49.     Upon information and belief, McKay, began organizing the HR IT Insight event several months prior to announcing its existence by, among other things, creating the HR IT Insight website, soliciting vendors, soliciting sponsors, finding and booking a venue, and soliciting analysts.

50.     McKay has partnered with Gartner's direct competitor, IDC Research, Inc., to, among other things, provide analysts for the HR IT Insight event.

51.     McKay currently is soliciting IT executive attendees.

**COUNT ONE:**     **(Breach of Non-Competition/Non-Solicitation Agreement)**

52.     Paragraphs 1 through 51, above, are repeated and re-alleged as if fully set forth herein.

53.     Upon information and belief, McKay has created PPM Media to compete directly with Gartner in the executive events market.

54.     Upon information and belief, McKay is developing, marketing and selling products and/or services that are competitive with Gartner's products and services.

55.     By creating PPM Media and developing, organizing and promoting the HR IT Insight event, McKay has breached the non-compete provisions of the Agreement.

56.     Upon information and belief, McKay has solicited Gartner vendor and IT executive clients for the purpose of marketing and/or selling the HR IT Insight event.

57.     By soliciting Gartner clients, McKay has breached the non-solicitation provisions of the Agreement.

58.     McKay's actions have caused and will continue to cause imparable harm and other damages to Gartner to an extent currently undetermined.

**COUNT TWO:**        **(Breach of Confidentiality/Non-Disclosure Agreement)**

59.     Paragraphs 1 through 58, above, are repeated and re-alleged as if fully set forth herein.

60.     In his capacity as Group Vice President of Vision Events, McKay was exposed to Gartner's highly confidential and proprietary business plans and other Confidential Information.

61.     Upon information and belief, McKay has used and/or disclosed or will inevitably use and/or disclose Gartner's Confidential Information, including, but not limited to Gartner's Vision Events client list, marketing plans, pricing strategies and future business development plans.

- 15 -

62.    McKay's actions were willful and deliberate and have caused and will continue
to cause irreparable injury to Gartner for which there is no adequate remedy at law.

63.    McKay's willful and deliberate actions have breached the express terms of the
Agreement including, but not limited to, the confidentiality and non-disclosure covenants
contained in Section 1 of the Agreement.

64.    McKay's actions have caused and will continue to cause irreparable harm and
other damages to Gartner to an extent currently undetermined.

**COUNT THREE:**    **(Breach of Non-Recruitment/Non-Hire Agreement)**

65.    Paragraphs 1 through 64, above, are repeated and re-alleged as if fully set forth
herein.

66.    Upon information and belief, McKay has recruited at least one Gartner
employee to terminate her employment with Gartner in order to work for PPM Media.

67.    In so doing, McKay's actions were willful and deliberate and have caused and
will continue to cause irreparable injury to Gartner for which there is no adequate remedy at
law.

68.    McKay's willful and deliberate actions have breached the express terms of the
Agreement including, but not limited to, the non-recruitment covenants contained in Section 5
of the Agreement.

69.    McKay's actions have caused and will continue to cause irreparable harm and
other damages to Gartner to an extent currently undetermined.

- 16 -

**COUNT FOUR:**    (Misappropriation of Trade Secrets pursuant to
Conn. Gen. Stat. §§ 35-50 et seq.)

70.    Paragraphs 1 through 69, above, are repeated and re-alleged as if fully set forth
herein.

71.    The use and dissemination, and threatened use and dissemination, by McKay of
Gartner's Confidential Information constitute misappropriation of Gartner's Confidential
Information.

72.    McKay's actions in misappropriating Gartner's confidential, proprietary and
trade secret information were willful and malicious and have caused and will continue to cause
irreparable injury to Gartner for which there is no adequate remedy at law.

73.    Moreover, McKay has been unjustly enriched and Gartner has suffered damage
as a result of defendant's misappropriation, for which Gartner is entitled to an award of
damages pursuant to Conn. Gen. Stat. § 35-53(a).

74.    McKay's misappropriation was willful and malicious, entitling Gartner to
punitive damages and reasonable attorney's fees pursuant to Conn. Gen. Stat. § 35-53(b).

**COUNT FIVE:**    (Violation of CUTPA, Conn. Gen. Stat. §§ 42-110a et seq.)

75.    Paragraphs 1 through 74, above, are repeated and re-alleged as if fully set forth
herein.

76.    Gartner is a person within the meaning of Conn. Gen. Stat. §§ 42-110a(3) and
42-110g(a) entitled to bring an action under the Connecticut Unfair Trade Practices Act
("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq.

77.     At all relevant times, defendant was a person acting in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. §§ 42-110a et seq.

78.     The foregoing actions of the defendant constitute unfair and deceptive acts and practices in the conduct of trade or commerce that are unethical, unscrupulous and offensive to public policy, and are a violation of Conn. Gen. Stat. § 42-110b(a).

79.     As a result of the foregoing unfair and deceptive acts and practices, Gartner has suffered an ascertainable loss within the meaning of Conn. Gen. Stat. §§ 42-110g(a) and has suffered damages in an amount to be determined at trial.  Moreover, defendant's foregoing conduct has caused and will continue to cause irreparable injury to Gartner for which Gartner has no adequate remedy at law.

80.     The foregoing actions of the defendants show calculated, deceitful and unfair conduct, and reckless indifference to the rights of Gartner.  Accordingly, defendant is liable to Gartner for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

81.     Gartner is mailing a copy of this Complaint to the Attorney General of the State of Connecticut and to the Commissioner of Consumer Protection for the State of Connecticut, as required by Conn. Gen. Stat. § 42-110g(c).

**WHEREFORE,** the Plaintiff seeks:

1.      A preliminary and permanent injunction enjoining and restraining the defendant, Philip McKay:

a.      From organizing, developing, promoting, advertising or holding the HR IT Insight event;

b.      From using directly or indirectly any of Gartner's confidential, proprietary or trade secret information;

c.      From disclosing in any manner to anyone any of Gartner's confidential, proprietary or trade secret information;

d.      From breaching the terms of the non-competition/non-solicitation covenants contained in the Agreement;

e.      From breaching any of the terms of the confidentiality/non-disclosure covenants contained in the Agreement;

f.      From breaching any of the terms of the non-recruitment or non-hire covenants contained in the Agreement; and

g.      Ordering that the defendant, Philip McKay, deliver to this Court within seven (7) days of the entry of the preliminary injunction a certification to the Court that he has searched for and turned over, pursuant to the terms of the injunction order, all originals and all copies or derivations made therefrom of documents, forms, computer disks and print-outs containing information regarding Gartner's confidential, proprietary or trade secret information;

2.      An Order extending the term of the restrictive covenants contained in that

certain Agreement Regarding Certain Conditions of Employment for a period of time equal to

the time that Philip McKay has been in breach;

3.      Monetary damages in such amount as are proven at trial;

4.      Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a);

5.      All damages, including punitive damages, pursuant to Conn. Gen. Stat. § 35-53;

6.      Attorney's fees and costs pursuant to Conn. Gen. Stat. §§ 35-53(b), 42-110g(d);

7.      Costs;

8.      Interest; and

9.      Any other such relief at law or in equity that the court deems just and

appropriate.

### Jury Demand

Trial by jury is hereby demanded as to all counts and allegations so demandable.


**PLAINTIFF,**
**GARTNER, INC.**


By: _____

Glenn M. Cunningham (Fed. Bar No. ct09995)
Susan S. Murphy (Fed. Bar No. ct25321)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel: (860) 251-5000
Fax: (860) 251-5218
Email:  gcunningham@goodwin.com
Email:  smurphy2@goodwin.com
Its Attorneys

428001 v.04 S1

- 20 -

## VERIFICATION

Mary Ellen Sheehy duly certifies that she is the Group Vice President, Strategy and Planning, Gartner Worldwide Events, she has read the contents of the attached Verified Complaint, she is familiar with the contents therein, and she certifies that the contents of the Verified Complaint are true to the best of her knowledge, information and belief.


_Mary Ellen Sheehy_
Mary Ellen Sheehy


STATE OF NEW HAMPSHIRE            )
                                  ) ss.: Wilmot Flat
COUNTY OF MERRIMACK               )


Subscribed and sworn to before me this _15_ day of November 2006.


_Paul Messer_
Notary Public/Commissioner of the Superior Court
My Commission Expires:
                                        PAUL MESSER
                                        NOTARY PUBLIC
                                        State of New Hampshire
                                        My Commission Expires
                                        January 26, 2010


451894 v.01 S2