UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GARTNER, INC., | : | |
| | : | CIVIL ACTION NO. 3:06-cv-1869 (CFD) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PHILIP MCKAY, | : | |
| | : | |
| Defendant. | : | DECEMBER 13, 2006 |
| | : | |

**PLAINTIFF'S PROPOSED
FINDINGS OF FACT, PROPOSED
CONCLUSIONS OF LAW, LIST OF ANTICIPATED
WITNESSES AND LIST OF ANTICIPATED EXHIBITS**

Pursuant to this Court's December 4, 2006 Order to Show Cause, the plaintiff, Gartner,

Inc. ("Gartner"), hereby respectfully submits its (1) proposed findings of fact; (2) proposed

conclusions of law; (3) list of anticipated witnesses; and (4) list of anticipated exhibits in

preparation for the preliminary injunction hearing set in this matter for December 20, 2006.

**I.     PLAINTIFF'S PROPOSED FINDINGS OF FACT**

**Gartner and Its Events Business**

1.     **(Stipulated)**    The plaintiff Gartner is a corporation organized and existing

under the laws of the State of Delaware, with its principal place of business in Stamford,

Connecticut. (Testimony of Mary Ellen Sheehy, Group Vice President, Strategy and Planning,

Gartner Worldwide Events ("Sheehy Test."))

2.    **(Stipulated)**   With a presence in seventy-five (75) countries worldwide, Gartner is the leading global provider of research and analysis in the information technology ("IT") industry and serves 10,000 organizations, including chief information officers and other senior IT executives in corporations and government agencies, as well as technology companies and the investment community. (Sheehy Test.)

3.    **(Stipulated)**   Gartner's principal business segments consist of Gartner Research, Gartner Executive Programs, Gartner Consulting and Gartner Events. (Sheehy Test.)

4.    **(Stipulated)**   Gartner Events, including Gartner's Vision Events Program, includes over seventy (70) conferences annually that take place all over the world, servicing over thirty thousand IT executives and hundreds of IT vendors. (Sheehy Test.)

5.    **(Stipulated)**   In 2006, Gartner events took place throughout the United States, Latin America, Europe and Asia-Pacific. (Sheehy Test.)

6.    Gartner's events bring together leading IT vendors and senior-level IT executives who make technology purchasing decisions. (Sheehy Test.)

7.    Gartner's flagship event is its Symposium/ITxpo, which brings together senior-level IT executives from all major industry categories and hundreds of IT vendors in a conference that includes sessions on all aspects of IT solutions. (Sheehy Test.; Exhibit 2)

8.    **(Stipulated)**   In 2006, Gartner hosted its Symposium/ITxpo in San Francisco, California and Orlando, Florida as well as in Barcelona, Cannes, Capetown, Sydney and Tokyo. (Sheehy Test.)

- 2 -

9.    **(Stipulated)**   Gartner events also include Technology Summits, which are conferences that focus on particular topics such as security, wireless technology, or data center issues and the impact of IT on specific industries such as the public sector, utilities and financial services.  (Sheehy Test.)

10.    **(Stipulated)**   One such technology summit is Gartner's annual Data Center Conference, which brings together senior level IT executives and vendors of data center solutions.  (Sheehy Test.; Exhibit 3)

11.    **(Stipulated)**   Gartner hosted its 2006 Data Center Conference in Las Vegas, Nevada as well as in London and Sydney.  (Sheehy Test.)

12.    Gartner's events business also includes its Vision Events Programs, which are highly focused, business-intensive events that bring together leading IT vendors and senior-level IT decision-makers.  (Sheehy Test.)

13.    In 2006, Gartner hosted its Vision Events Programs in Arizona, California, Florida, Illinois, Massachusetts, Michigan, Pennsylvania, Tennessee and Washington, D.C., as well as in Amsterdam, Barcelona, London, Melbourne, Mexico City, Sao Paolo, Sydney and Tokyo.  (Sheehy Test.)

14.    Gartner has developed a unique format for its Vision Events Programs over many years at great effort and expense.  (Sheehy Test.)

15.    The unique elements of Gartner's Vision Events Programs include:

   (a)    Attendance at events by invitation only and prospective attendees apply online to Gartner to qualify for attendance;

   (b)    Attendees are "hosted" by Gartner in that Gartner pays travel and lodging expenses for those it selects;

- 3 -

(c)     Using a proprietary matchmaking technology, Gartner schedules private meetings between IT vendors and a guaranteed group of IT purchasing decision-makers;

(d)     Using a proprietary matchmaking technology, Gartner matches up IT vendors and IT decision-makers and schedules one-on-one meetings between them;

(e)     Using a proprietary matchmaking technology, Gartner sets up one-on-one sessions with industry analysts and attendees;

(f)     Gartner and other industry analysts meet with attendees in group sessions

(g)     Gartner analysts and consultants moderate best practices discussions, which can include other industry experts;

(h)     Using a proprietary matchmaking technology, Gartner matches up attendees for peer exchanges; and

(i)     roundtable discussions.

(Sheehy Test.)

16.     **(Stipulated)**   One such Vision Events Program is Gartner's Midsize Enterprise Summit, which addresses IT issues unique to midsize organizations.  (Sheehy Test.; Exhibit 1)

17.     Gartner's events cover a wide variety of IT technology topics, including human resources ("HR") IT solutions.  (Sheehy Test.)

18.     Gartner's events also include sessions on computer server systems, including blade server systems.  (Sheehy Test.; Exhibits 1, 2 and 3)

19.     Gartner's 2006 Symposium/ITxpo included sessions on blade server systems. (Sheehy Test.; Exhibit 2)

20.     Gartner's 2006 Data Center Conference included sessions discussing blade server systems.  (Sheehy Test.; Exhibit 3)

- 4 -

21.     Gartner's Midsize Enterprise Summit included sessions discussing blade server systems.  (Sheehy Test.; Exhibit 1)

22.     The IT vendors and senior IT executives to whom Gartner markets its events and who attend such events include vendors and purchasers of HR IT solutions and blade server systems.  (Sheehy Test.)

### The Events Sponsors

23.     **(Stipulated)**   Gartner markets its events to IT vendors with which it partners to sponsor and promote its events ("Event Sponsors").  (Sheehy Test.)

24.     Gartner's Events Sponsors are critical to the success of its events in that the Event Sponsors provide significant financial backing for the events and act as a significant draw for other vendors and attendees.  (Sheehy Test.)

25.     There are varying levels of Event Sponsorship dependant upon the amount contributed by the Event Sponsor.  The Sponsorship levels include Premier, Marketplace, Continental, Diamond, Platinum, Gold, Silver, and Bronze Sponsors, with Premier Sponsors contributing the largest amount to the event being sponsored.  (Sheehy Test.)

26.     Two of Gartner's major Event Sponsors are American Power Conversion ("APC") and Emerson Network Power ("Emerson").  (Sheehy Test.)

27.     APC was a Premier Sponsor of Gartner's 2006 Symposium/ITxpo, a Premier Sponsor of Gartner's 2006 Data Center Conference and a Diamond Sponsor of Gartner's Midsize Enterprise Summit.  (Sheehy Test. Exhibits 1, 2 and 3)

28.     Emerson was a Marketplace Sponsor of Gartner's 2006 Symposium/ITxpo, a

Premier Sponsor of Gartner's 2006 Data Center Conference and Platinum Sponsor of Gartner's

Midsize Enterprise Summit.  (Sheehy Test.; Exhibits 1, 2 and 3)

<h2 align="center">McKay Manages Gartner's Vision Events</h2>

29.     Beginning on or about July 8, 2002, Gartner employed McKay as a high-level

executive in its Vision Events Program.  (Sheehy Test.; Exhibit 4)

30.     **(Stipulated)**   McKay's starting salary with Gartner was $190,000 annually plus

bonus and stock option grants.  (Sheehy Test.; Exhibit 4)

31.     **(Stipulated)**   McKay eventually attained the position of Group Vice President

of the Worldwide Vision Organization.  (Sheehy Test.)

32.     **(Stipulated)**   In his capacity of Group Vice President, McKay was a member of

Gartner's seven-person Events Leadership Team.  (Sheehy Test.)

33.     **(Stipulated)**   Data regarding events, Event Sponsors, event attendees, vendors

and topics is shared across Gartner's events business.  (Sheehy Test.)

34.     **(Stipulated)**   In his capacity as Group Vice President, McKay was responsible

for all aspects of Gartner's global Vision Events Program and for supporting Gartner's events

business generally, including:

      (a)     managing product development;

      (b)     sponsorship sales;

      (c)     sponsor, vendor and attendee recruitment;

      (d)     web development;

      (e)     marketing strategy and collateral production; and

- 6 -

      (f)      establishing and maintaining client and supplier relationships.

(Sheehy Test.)

      35.      McKay had weekly contact with Event Sponsors, events advisory boards, event attendees, media partners and suppliers.  (Sheehy Test.)

      36.      **(Stipulated)**  McKay personally attended most events.  (Sheehy Test.)

      37.      McKay was responsible for maintaining Gartner's relationship with its Event Sponsors.  (Sheehy Test.)

      38.      **(Stipulated)**  McKay was responsible for creating all of the events budgets and managing the profitability of Gartner's Vision Events Program.  (Sheehy Test.)

      39.      Through his work as Group Vice President, McKay created and worked with Gartner's Confidential Information, which included:

      (a)      Gartner's complete attendee and vendor sponsor database;

      (b)      Gartner's proprietary matchmaking process;

      (c)      Gartner's product and pricing plans;

      (d)      Gartner's marketing strategies;

      (e)      Gartner's supplier relationships and contracts; and

      (f)      Gartner's budget information.

(Sheehy Test.)

      40.      Gartner developed its highly valuable Confidential Information over the course of many years through trial and error at great effort and expense.  Gartner's Confidential Information is valuable to Gartner and would be of invaluable assistance to Gartner's competitors if disclosed to them in that they would thereby have a blueprint for organizing,

- 7 -

staffing and conducting a Gartner event and would understand Gartner's cost and profit models, plans for future events and they would benefit from understanding the successes and failures of Gartner's events to date.  (Sheehy Test.)

41.    The Confidential Information is not known to others outside of Gartner and could not be properly acquired or duplicated by others without the investment of significant capital and other time and resources.  (Sheehy Test.)

42.    Gartner protects and maintains the secrecy of its Confidential Information by physically limiting access to such information, by maintaining and making known to its employees, specific and express policies regarding the Confidential Information, and by requiring its employees to enter into a confidentiality/non-disclosure agreement as a condition of employment.  (Sheehy Test.; Exhibit 5; Exhibit 6)

43.    **(Stipulated)**   During his tenure as the head of Gartner's Vision Events Program, McKay was responsible for the Midsize Enterprise Summit.  (Sheehy Test)

## McKay Enters Into the Agreement

44.    **(Stipulated)**   In consideration for and as a condition of his employment with Gartner, McKay executed an Agreement Regarding Certain Conditions of Employment (the "Agreement") on or about July 11, 2002, which contained, among other things, non-compete and non-solicitation covenants.  (Exhibit 5)

45.    Specifically, pursuant to section 5 of the Agreement, McKay agreed that for one year following the termination of his employment he would not do any of the following:

(a)    engage in "Competitive Acts";

        (b)     engage in "Competitive Acts" with any entity or individual to whom he submitted proposals for specific services on behalf of Gartner for one year prior to the termination of his employment; or

        (c)     engage in "Competitive Acts" within a fifty (50) mile radius of the principal office in which he worked at any time for one year prior to the termination of his employment; or

(Exhibit 5)

    46.    **(Stipulated)**   The "Competitive Acts" include both:

        (a)     developing, marketing or selling (or assisting others to develop, market or sell) products or services that are competitive with Gartner for one year following the termination of employment (the "Non-Competition Covenant"); and

        (b)     soliciting, directly or indirectly, Gartner's clients or known prospects for the purposes of developing, marketing or selling competitive products or services for one year following the termination of employment (the "Non-Solicitation Covenant").

(Exhibit 5)

    47.    McKay also expressly agreed that, during the term of his employment and for a period of three years following the termination thereof, he would not, on his own behalf or for anyone else, hire, recruit, or encourage any Gartner employee to leave the employ of Gartner (the "Non-Recruitment/Non-Hire Covenant").  (Exhibit 5)

    48.    Pursuant to section 5(e) of the Agreement, McKay agreed that the limitations periods contained in the Non-Competition, Non-Solicitation and Non-Recruitment/Non-Hire Covenants "shall be tolled for the length of time during any period in which any of the restrictions are violated."  (Exhibit 5).

    49.    McKay expressly acknowledged and section 8 of the Agreement provides that:

        Court's Rights to Modify Restrictions.  I acknowledge that the Employer has attempted to limit my ability to compete with the Employer to a reasonable extent and it is my desire and intent that the provisions of this Agreement shall

- 9 -

> be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. I agree that if a court finds that the scope of any of the covenants contained in section 5 or elsewhere in this Agreement shall be invalid, illegal, excessively broad, unreasonable, or unenforceable in any respect, then the court may modify and reform the covenant to render it reasonable and enforceable.

(Exhibit 5)

50.     Section 7 of the Agreement provides that Gartner is entitled to immediately

obtain and enforce an injunction prohibiting any employee from violating any terms of the

Agreement. (Exhibit 5)

51.     Section 7 of the Agreement further provides that Gartner's right to obtain and

enforce an injunction shall be in addition to any other remedy available to Gartner at law or in

equity. (Exhibit 5)

52.     **(Stipulated)**   Section 11 of the Agreement contains a choice of law and forum

selection clause pursuant to which the parties have consented to the jurisdiction of the federal

courts in Connecticut and agreed that the Agreement and the rights of the parties shall be

governed by the laws of the State of Connecticut. (Exhibit 5)

## McKay's Departure From Gartner

53.     McKay's employment with Gartner was terminated as of December 13, 2005.

(Sheehy Test.)

54.     **(Stipulated)**   As part of his separation from Gartner, McKay was offered and

accepted a severance package pursuant to which McKay was paid his salary and health benefits

for twenty-six (26) weeks following the termination of his employment. (Exhibit 8)

- 10 -

55.     **(Stipulated)**     In connection with his acceptance of the severance package, McKay and Gartner entered into a Separation Agreement and Release of Claims ("Separation Agreement") dated December 13, 2006.  (Sheehy Test.; Exhibit 8)

56.     **(Stipulated)**     Pursuant to section 4 of the Separation Agreement, McKay restated his commitment "to adhere to those obligations to Gartner as are set forth in the Agreement Regarding Certain Conditions of Employment, including, but not limited to the post termination restrictions regarding confidential information, non-competition and non-solicitation."  (Exhibit 8)

57.     **(Stipulated)**     Pursuant to section 4 of the Separation Agreement, McKay acknowledged and agreed that the Agreement and the restrictive covenants contained therein "remain in full force and effect and are not amended in any way by this [Separation] Agreement."  (Exhibit 8)

58.     **(Stipulated)**     At or about the time his employment with Gartner was terminated, McKay was verbally reminded by Gartner of his obligations under the Agreement. (Sheehy Test.)

## McKay Forms PPM Media to Compete With Gartner

59.     In or about June 2006, McKay formed PPM Media, Inc. ("PPM Media").

60.     **(Stipulated)**     McKay is the President and CEO of PPM Media.  (Exhibit 9)

61.     McKay has solicited, recruited and/or hired at least one Gartner employee, Eda Fantasia-Campo.  (Exhibit 10)

62.     **(Stipulated)**     McKay creates, produces and manages business-to-business events.  (Exhibit 9)

63.    McKay targets Gartner's IT vendors and IT executive attendees for his events. (Sheehy Test.)

64.    The format of McKay's events mimics almost exactly the format of Gartner's Vision Events programs.  (Sheehy Test.)

65.    **(Stipulated)**    Specifically, McKay's events include:

    (a)    scheduled meetings between IT vendors and IT executives;

    (b)    one-on-one meetings between the IT vendors and IT decision makers;

    (c)    group and one-on-one sessions with industry analysts;

    (d)    peer exchange sessions; and

    (e)    roundtable and panel discussions.

(Exhibits 12 and 14)

66.    Like Gartner's Vision Events Program, attendance at McKay's events is by invitation only and McKay's event websites allow a prospective attendee to apply online to qualify for attendance.  (Exhibits 12 and 14)

67.    Like Gartner, PPM Media pays for chosen attendee's travel and accommodation expenses.  (Exhibits 12 and 14)

68.    Like Gartner, McKay solicits and partners with IT companies to sponsor his events.  (Exhibit 14)

## Gartner Reminds McKay of His Obligations Under the Agreement

69.    **(Stipulated)**    By letter dated September 22, 2006, Gartner noted McKay's formation of PPM Media and reminded McKay of his obligations under the Agreement. (Exhibit 16)

70.    In particular, Gartner put McKay on notice that the "Competitive Acts" prohibited by the Agreement include the development and marketing of competing events during the year following the termination of his employment.  (Exhibit 16)

71.    **(Stipulated)**  McKay responded by letter dated October 9, 2006, denying that he was engaging in activities that were in breach of the Agreement.  (Exhibit 17)

72.    Less than one month later, McKay announced and promoted two events competitive with Gartner events.  (Sheehy Test., Exhibits 10, 11, 12 and 14)

## McKay Plans, Organizes and
## Promotes the Competitive Events

73.    **(Stipulated)**    In late October, by press release and on the internet, McKay announced and promoted the HR IT Insight event and the Blade System Insight event. (Exhibits 10, 11, 12 and 14)

74.    **(Stipulated)**    McKay planned and organized the HR IT Insight event and the Blade System Insight Event.  (Exhibits 9, 12 and 14)

75.    **(Stipulated)**    The HR IT Insight event was scheduled to take place in or about March 2007 in Savannah, Georgia.  (Exhibits 10 and 12)

76.    **(Stipulated)**    The Blade Systems Insight event is scheduled to take place in or about April 2007 in Savannah, Georgia.  (Exhibits 11 and 14)

77.    **(Stipulated)**    McKay began organizing the HR IT Insight event and the Blade System Insight event several months prior to announcing their existence by, among other things, creating the HR IT Insight and Blade System Insight websites, creating marketing

- 13 -

collateral, hiring a sales director, drafting press releases, soliciting vendors, soliciting Event

Sponsors, finding and booking venues, and soliciting analysts. (Sheehy Test.)

78.     **(Stipulated)**   McKay created the HR IT Insight website on or about August 11,

2006. (Exhibit 13)

79.     **(Stipulated)**   McKay created the Blade System Insight website on or about

October 3, 2006. (Exhibit 15)

80.     **(Stipulated)**   The HR IT Insight event and Blade System Insight event target

both IT vendors and senior-level IT executives. (Sheehy Test.; Exhibits 12 and 14)

81.     McKay has partnered with Gartner's direct competitor, IDC Research, Inc., to

provide analysts for both events. (Sheehy Test.; Exhibits 10 and 11)

82.     **(Stipulated)**   McKay has solicited IT executive attendees for both events.

(Exhibits 12 and 14)

83.     **(Stipulated)**   McKay continues to solicit attendees for the Blade System Insight

Event. (Exhibit 14)

84.     McKay has solicited and partnered with APC and Emerson, major Event

Sponsors of Gartner events, to sponsor the Blade Systems Insight event. (Sheehy Test.;

Exhibit 14)

## II.     PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

### A.     Preliminary Injunction Standard

1.     Gartner is entitled to preliminary injunctive relief in this matter because it has

demonstrated that it will continue to suffer irreparable injury if an injunction is not issued

against McKay, and has further demonstrated a likelihood of success on the merits of its

claims.  See, e.g., Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 967 (2d Cir.

1995); McNeilab, Inc. v. Am. Home Prods. Corp., 848 F.2d 34, 37 (2d Cir. 1988); Jackson

Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam).

### B.    Gartner Has Established Irreparable Harm

2.    Irreparable harm is presumed to arise from McKay's breach of the restrictive

covenants contained in the Agreement.  Health Consultants Group, LLC v. Dailey, No.

04civ4586, 2004 U.S. Dist. LEXIS 27318, at *15 (S.D.N.Y. Aug. 24, 2004); see also

Sabatasso v. Bruno, No. CV030284486S, 2004 Conn. Super. LEXIS 899, at *7-*8 (Conn.

Super. Ct. Apr. 8, 2004); Piscitelli v. Pepe, No. CV044002472S, 2004 Conn. Super. LEXIS

3264, at *13 (Conn. Super. Ct. Nov. 5, 2004).

### C.    Gartner Has Established a Likelihood of Success on the Merits

#### 1.    Breach of the Agreement

##### a.    Gartner Is Likely to Succeed on Its Claim that McKay Has Breached the Agreement

3.    McKay's development, marketing and sale of the HR IT Insight Event and the

Blade Systems Insight Event violate section 5(b)(iii) of the Agreement.

4.    McKay's solicitation of APC as a sponsor of the Blade System Insight Event

violated section 5(b)(iii) of the Agreement.

5.    McKay's solicitation of Emerson as a sponsor of the Blade System Insight Event

violated section 5(b)(iii) of the Agreement.

6.    McKay's recruitment and hiring of Eda Fantasia-Campo violated section 5(d) of

the Agreement.

- 15 -

7.    The arbitration provision of the Separation Agreement does not apply to claims brought for breach of the Agreement.

## b.    The Agreement Is Governed By Connecticut Law

8.    Connecticut law applies to the Agreement and the rights of the parties.  Valley Juice Ltd. v. Evian Waters of France, Inc., 87 F.3d 604, 608-09 (2d Cir. 1996) (noting that choice of law clauses are recognized as proper in Connecticut; affirming application of law of state chosen by parties to contract).

## c.    The Agreement Is Reasonable and Enforceable

9.    A restrictive covenant need only be reasonable to be enforceable.  New Haven Tobacco Co. v. Perrelli, 11 Conn. App. 636, 638 (1987).

10.    The restrictive covenants contained in the Agreement are reasonable and enforceable in that: (a) the length of time the restrictions operate is reasonable; (b) the geographical area covered is reasonable; (c) the protections accorded to Gartner are fair; (d) the restraint on McKay's opportunity to pursue his occupation is reasonable; and (e) the covenants do not interfere with the public's interest.  See Robert S. Weiss & Assoc. v. Wiederlight, 208 Conn. 525, 529 n.2 (1988).

## i.    The Temporal and Geographic Scope of the Agreement Is Reasonable.

11.    The one-year term of the Non-Competition and Non-Solicitation covenants is reasonable.  Wiederlight, 208 Conn. at 531 (two-year covenant enforced); Scott v. Gen. Iron & Welding Co., 171 Conn. 132, 140 (1976) (five-year covenant enforced); Torrington Creamery, Inc. v. Davenport, 126 Conn. 515, 520 (1940) (two-year covenant enforced); Hart,

- 16 -

Nininger & Campbell Assocs., Inc. v. Rogers, 16 Conn. App. 619 (1988) (two-year covenant enforced).

12.    The Non-Competition and Non-Solicitation Covenants are reasonably limited in time and geographic scope in that they protect Gartner only in areas where it is doing business or is likely to do business.  See 3M v. Francavilla, 191 F. Supp. 2d at 280 (concluding non-compete agreement global in scope reasonable where did not protect employer in areas where employer did not conduct business); see also Branson Ultrasonics Corp. v. Stratman, 921 F. Supp. 909, 913 (D. Conn. 1996) (finding non-competition covenant with no geographic restriction was reasonable in light of the employer's international marketing activities) ; Wiederlight, 208 Conn. at 531 (concluding non-competition covenant with no geographic restriction reasonable where limited to employer's customers); Nelson v. Evans, Sherers & Leonard, No. CV930522942, 1995 Conn. Super. LEXIS 3483, *7  (Conn. Super. Ct. Dec. 8, 1995) ("[T]he restrictive covenant is reasonable in that it is limited to plaintiff soliciting only defendant's former customers."); cf. Scott, 171 Conn. at 138 ("A restrictive covenant which protects the employer in areas in which he does not do business or is unlikely to do business is unreasonable with respect to area.").

13.    The Non-Recruitment/Non-Hire covenant is reasonably limited to three years after termination of employment and is reasonably limited in that it prevents the solicitation only of Gartner's employees.  See 3M v. Francavilla, 191 F. Supp. 2d at 280; see also Branson, 921 F. Supp. at 913; Scott, 171 Conn. at 138; Wiederlight, 208 Conn. at 531.

- 17 -

### ii.   The Protections Accorded to Gartner by the Agreement Are Fair.

14.   The protections afforded to Gartner by the Agreement are fair in that they are reasonably necessary to protect Gartner's business and its rights. 3M v. Francavilla, 191 F. Supp. 2d at 280-81.

15.   The Agreement is reasonably necessary to protect Gartner's goodwill with its Event Sponsors, other vendors and attendees. See New Haven Tobacco, 11 Conn. App. at 642 n.5 ("Where the goodwill of the employer's customers has been generated by the efforts expended by the employer, such as the investment of his time and money, that goodwill is appropriately attributed to the employer rather than to the employee.")

16.   The Agreement is reasonably necessary to allow Gartner a period of time in which to restaff in order to serve the customers formerly serviced by McKay. Van Dyck Printing, 43 Conn. Supp. at 197-98; see also Wiederlight, 208 Conn. at 533.

### iii.   The Agreement Does Not Violate Public Policy and Does Not Interfere With McKay's Opportunity to Pursue His Occupation.

17.   McKay freely entered into the Agreement thereby receiving the benefit of employment and compensation and, therefore, the public interest requires that he be bound by the terms of the Agreement. New Haven Tobacco, 11 Conn. App. at 643.

18.   The Agreement does not seek to protect an interest not legally recognized or deprive the public of essential goods or services and, therefore, it does not unreasonably interfere with the interests of the public. Health Consultants, 2004 U.S. Dist. LEXIS 27318, at *18; New Haven Tobacco, 11 Conn. App. at 642.

- 18 -

19.     The Agreement does not force McKay to sacrifice his livelihood, it merely requires that he not compete directly with Gartner for one year. Such a restriction is valid and enforceable. 3M v. Francavilla, 191 F. Supp. 2d at 281.

## III.    LIST OF PLAINTIFF'S ANTICIPATED WITNESSES

1.     Testimony of Mary Ellen Sheehy, Group Vice President, Strategy and Planning, Gartner Worldwide Events regarding Gartner's events business, McKay's employment with Gartner and McKay's breach of the Agreement.

2.     Testimony of Philip McKay regarding his employment with Gartner, the creation and conduct of PPM Media, the creation and promotion of the HR IT Insight event and the creation and promotion of the Blade Systems Insight event.

## IV.    LIST OF PLAINTIFF'S ANTICIPATED EXHIBITS

1.     Exhibit 1: Midsize Enterprise Summit Brochure

2.     Exhibit 2: Symposium/ITxpo Brochure

3.     Exhibit 3: Data Center Conference Brochure

4.     Exhibit 4: Offer of Employment

5.     Exhibit 5: Agreement Regarding Certain Conditions of Employment

6.     Exhibit 6: Gartner Code of Conduct

7.     Exhibit 7: Resume of Philip McKay

8.     Exhibit 8: Separation Agreement and Release of Claims

9.     Exhibit 9: PPM Media Website

10.    Exhibit 10: Press Releases re HR IT Insight event

11.    Exhibit 11: Press Releases re Blade Systems Insight event

12.     Exhibit 12: HR IT Insight Website

13.     Exhibit 13: HR IT Insight Website Registry Data

14.     Exhibit 14: Blade System Insight Website

15.     Exhibit 15: Blade System Insight Website Registry Data

16.     Exhibit 16: September 18, 2006 Letter from Ray Bernstein to Philip McKay

17.     Exhibit 17: October 9, 2006 Letter from Philip McKay to Ray Bernstein

PLAINTIFF,
GARTNER, INC.,

By _____
    Glenn M. Cunningham (ct09995)
    Susan S. Murphy (ct25321)
    For Shipman & Goodwin LLP
    One Constitution Plaza
    Hartford, CT 06103
    Phone: (860) 251-5000
    Fax: (860) 251-5218
    Email: gcunningham@goodwin.com
    Email: smurphy2@goodwin.com
    Its Attorneys

455494

## CERTIFICATION OF SERVICE

I hereby certify that on this 13th day of December, 2006, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

Susan. S. Murphy

455494

- 21 -